**PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, INC.; Environmental Defense Fund and New Jersey Environmental Lobby, Plaintiffs,**

v.

**FEDERAL HIGHWAY ADMINISTRATION; Rodney Slater, Administrator; Russell A. Eckloff, Jr., Division Administrator; United States Department of Transportation; Federico Pena, Secretary and Frank J. Wilson, Commissioner of the New Jersey Department of Transportation, Defendants.**

Civ.A. No. 94–4292 (AJL).

United States District Court,
D. New Jersey.

March 20, 1995.

---

**878**

Edward Lloyd, William C. Sullivan, Jr., Rutgers Environmental Law Clinic, Newark, NJ, James T.B. Tripp, Environmental Defense Fund, New York City, for plaintiff.

Susan Handler–Menahem, U.S. Attys. Office, Newark, NJ, for defendants Federal Highway Admin., Rodney Slater, Russell A. Eckloff, Jr., U.S. Dept. of Transp. and Federico Pena.

Arlene R. Weiss, Sr. Deputy Atty. Gen., Trenton, NJ, for defendant Frank J. Wilson.

## OPINION

LECHNER, District Judge.

This action is brought by plaintiffs, Public Interest Research Group of New Jersey, Inc., Environmental Defense Fund and New Jersey Environmental Lobby (collectively "the Plaintiffs"), seeking declaratory and injunctive relief under the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370d (the "NEPA"), and the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (the "APA"). Plaintiffs seek to enjoin the defendants, Federal Highway Administration (the "FHWA"); Rodney Slater, Administrator; Russell A. Eckloff, Jr., Division Administrator; United States Department of Transportation; Federico Pena, Secretary; and Frank J. Wilson, Commissioner of New Jersey Department of Transportation (the "NJDOT") (collectively "the Defendants")[1], from constructing two High Occupancy Vehicle ("HOV") lanes on Route 287 in Morris County, New Jersey (the "Project"). *See* Complaint for Declaratory Judgment and Injunctive Relief (the "Complaint"), ¶¶ 1, 28.

Currently before the court are Plaintiffs' motion for permanent injunction (the "Motion for Permanent Injunction") and both the Federal and State Defendants' motions for summary judgment (the "Summary Judgment Motions").[2] For the reasons set forth

---

**1.** Five of the six Defendants are officials or agencies of the Federal Government (the "Federal Defendants"). They are: Federal Highway Administration; Rodney Slater, Administrator; Russell A. Eckloff, Jr., Division Administrator; United States Department of Transportation; and Federico Pena, Secretary.

Frank J. Wilson, Commissioner of the New Jersey Department of Transportation, is the state defendant (the "State Defendant").

**2.** Plaintiffs submitted: Plaintiffs' Motion for Permanent Injunction; Plaintiffs' Brief in Opposition to Defendants' Motions for Summary Judgment and in Support of Plaintiffs' Motion for Permanent Injunction (the "Plaintiffs' Opposition

below, Plaintiffs' Motion for Permanent Injunction is denied; Defendants' Summary Judgment Motions are granted.

*Procedural History*

On 1 September 1994, Plaintiffs filed the Complaint, seeking a declaratory judgment and injunctive relief. Complaint at 2. The Complaint seeks an order requiring the NJDOT to prepare an environmental impact statement ("EIS") or an environmental assessment ("EA") for the Project. *Id.* The Complaint alleges the FHWA's decision to grant a Categorical Exclusion ("CE") to the Project was arbitrary and capricious, and violated the NEPA. *Id.* at 2 to 3. Plaintiffs also seek to enjoin the FHWA from allocating any Federal funds to the Project, and to prohibit the NJDOT from soliciting bids or performing any further work on the Project. *Id.* at 3.

On 22 September 1994, the Plaintiffs filed an Order to Show Cause, seeking a Temporary Restraining Order barring Defendants from proceeding on the Project. The application was denied. *See* Docket Sheet. At the 22 September 1994 hearing, it was agreed Plaintiff would file a motion seeking a permanent injunction pursuant to Rule 12N, Appendix N of the Rules Governing the Unit-

ed States District Court for the District of New Jersey (the "Local Rules").

On 13 December 1994, the I–287/78 Corridor Coalition (the "Coalition"), submitted a motion to file an *amicus curiae* brief (the "Amicus Brief"). On 20 January 1995, the motion was denied. *See* opinion and Order, denying the Coalition's motion for leave to file an *Amicus* Brief.

On 7 February 1995, the parties filed, pursuant to Local Rule 12N, the Motion for Permanent Injunction and Summary Judgment Motions.[3] Oral argument was heard on 20 March 1995, at which time all counsel were given an opportunity to argue their positions with respect to this matter.

*Facts*

A. *The History of the Project*

1. *The Original Proposal*

In the mid–1980's, the NJDOT proposed the Project, which called for the construction of an additional lane in the east and west directions of Route 287 in portions of Somerset and Morris Counties. A.R. Vol. IA–27; Hamby Declaration at ¶ 2. The Project was proposed in response to numerous "citizen complaints" regarding traffic congestion and

Brief"), Brief in Support of Plaintiffs' Motion for Permanent Injunction (the "Plaintiffs' P.I. Brief"), Affidavit of Michael A. Replogle, dated 9 September 1994 (the "First Replogle Affidavit"), Second Affidavit of Michael A. Replogle, dated 29 November 1994 (the "Second Replogle Affidavit"), First Certification of William C. Sullivan, dated 20 September 1994; Second Certification of William C. Sullivan, dated 20 September 1994; Third Certification of William C. Sullivan, dated 9 December 1994; Exhibits AA–VV to the First Sullivan Certification, Exhibits XX–EEE to the Third Sullivan Certification; Defendants submitted: Brief in Support of Federal Defendants' Motion and in Opposition to Plaintiffs' Motion for Injunction (the "Federal Defendants' Brief"), Affidavit of Gary Hamby (the "Hamby Affidavit"), State Defendants' Brief in Support of Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Injunctive Relief (the "State Defendants' Brief"), Defendants' Joint Brief in Further Support of their Motions for Summary Judgment and in Opposition to Plaintiffs' Motion for a Permanent Injunction.

Defendants also submitted a joint administrative record (the "A.R."), consisting of Volumes IA through E, IIA through G, IIIA through E, and IV.

3. The motions were submitted after a two months delay, and one month after the scheduled return date. On 13 December 1994, the original due date for the Local Rule 12N submissions, Defendants submitted a letter (the "13 December Letter") explaining, "Plaintiffs had indicated on September 22, 1994 that they would shortly reserve their brief in support of a preliminary injunction with only minor changes to serve as a brief in support of a motion for a permanent injunction." *See* 13 December Letter. Defendants, accordingly, spent considerable time preparing a brief in support of their Summary Judgment Motion and in opposition to Plaintiffs' motion for injunctive relief. *Id.*

Instead of serving the original brief with "minor changes," however, Plaintiffs served Defendants with "a combined brief in support of injunctive relief and in opposition to [D]efendants' motions late in the afternoon on December 9, 1994, over two weeks after the agreed upon date and four days before [D]efendants' response was due." *Id.* Additionally, the issues raised by Plaintiffs were markedly different than those in the initial brief, thereby forcing Defendants to take more time than anticipated to reply. *Id.*

related problems. A.R. Vol. IA–42. The new lanes were to be added in the existing Route 287 median, and would continue for a distance of 21.7 miles. A.R. Vol. IA–25 to 27; Hamby Declaration at ¶ 2.

In reviewing a project with any potential environmental impact, the FHWA provides three classifications that control the level of documentation required before construction may begin:

(a) *Class I (EIS's)*. Actions that significantly affect the environment require an EIS (40 C.F.R. § 1508.27) . . . .

(b) *Class II (CE's)*. Actions that do not individually or cumulative[ly] have a significant environmental effect are excluded from the requirement to prepare an EA or EIS. A specific list of CE's normally not requiring NEPA documentation is set forth in § 771.117(c). When appropriately documented, additional projects may also qualify as CE's pursuant to § 771.117(d).

(c) *Class III (EA's)*. Actions in which the significance of the environmental impact is not clearly established. All actions that are not Class I or II are Class III. All actions in this class require the preparation of an EA to determine the appropriate environmental document required.

23 C.F.R. § 771.115.

At the time of the original Project proposal, the NJDOT's level of action determination indicated an EA would be prepared for the Project, pursuant to NEPA regulations.

4. CE's are actions that:
based on past experience with similar actions . . . do not involve significant environmental impacts. They are actions which: do not induce significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or other resource; do not involve significant air, noise, or water quality impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively have any significant environmental impacts. 23 C.F.R. § 771.117(a). By definition, therefore, CE's do not involve significant environmental impacts.

5. 40 C.F.R. § 1508.4 provides:

A.R. Vol. IA–25. An EA is a document examining the environmental impacts of a project. 23 C.F.R. § 771.119; Hamby Declaration at ¶ 2. The EA was indicated because, at the time of proposal, the Project did not qualify for a CE, pursuant to 23 C.F.R. § 771.117.[4] The FHWA concurred in the NJDOT's decision to prepare an EA. A.R. Vol. IA–29; Hamby Declaration at ¶ 2.

Subsequent to the Defendants' decision to prepare an EA, however, the FHWA amended 23 C.F.R. § 771.117. The regulation, as amended, provides, in pertinent part:

Additional actions which meet the criteria for a CE in the [Council on Environmental Quality (the "CEQ")] regulations (40 C.F.R. [§] 1508.4)[5] and paragraph (a) of this section [*see* n. 2, *supra*] may be designated as CE's only after Administration approval. The applicant shall submit documentation which demonstrates that the specific conditions or criteria for these CE's are satisfied and that significant environmental effects will not result. Examples of such actions include but are not limited to:

(1) Modernization of a highway by resurfacing, restoration, rehabilitation, reconstruction, adding shoulders, or adding auxiliary lanes (*e.g.* parking, weaving, turning, climbing).

(2) Highway safety or traffic operations improvement projects including the installation of ramp metering control devices and lighting . . . .

*Categorical exclusion* [CE] means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in § 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

23 C.F.R. § 771.117(d).[6]

At that point, the NJDOT determined that the Route 287 Project would not have significant environmental impacts and should qualify for a CE. The NJDOT, therefore, in compliance with the mandate of 23 C.F.R. § 771.117(d), submitted documentation justifying a CE for the Project. A.R. Vol. IV-2642 through 2664. The documentation provided information indicating: no significant socioeconomic impact was expected because all widening was to be done within the existing right-of-way; no significant archaeological impacts were expected because all construction was to take place on land previously disturbed by highway construction; no historical structures are on the site of the Project; the construction of the Project would comply with all regulations governing construction in the Buried Sole Source Aquifer Recharge Zone; all unavoidable impacts to wetlands would be mitigated and comply with the United States Army Corps of Engineers Section 404 Permit and with the New Jersey Freshwater Wetlands Act; and a noise study would be completed to determine the extent of noise impacts and determine whether noise barriers were feasible and cost-effective. Hamby Declaration at ¶ 4. The NJDOT concluded:

> With the inclusion of noise barriers at locations where they are found to be feasible and cost effective the proposed I-287 lane addition project will not have any significant social, economic or environmental impacts.

A.R. Vol. IV-2658.

Based on the documentation submitted by the NJDOT in accordance with 23 C.F.R. § 771.117(d), in July of 1988, the FHWA concurred in finding no significant environmental impact would result from the Project. Accordingly, the FHWA also concurred in granting a CE to the project. A.R. Vol. IV-2645; Hamby Declaration at ¶ 5.[7]

### 2. The HOV Lane Proposal

Subsequent to the CE classification for the Project, several pieces of Federal legislation were enacted, favoring the construction of HOV lanes.[8] In response to these legislative enactments, the NJDOT organized a steering committee to conduct a study to determine

---

6. Pursuant to 40 C.F.R. § 1508.4's requirement that categorical exclusions "shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect," 23 C.F.R. § 771.117(b) provides:

> Any action which normally would be classified as a CE but could involve unusual circumstances will require the Administration, in cooperation with the applicant, to conduct appropriate environmental studies to determine if the CE classification is proper. Such unusual circumstances include: (1) Significant environmental impacts; (2) Substantial controversy on environmental grounds; (3) Significant impact on properties protected by section 4(f) of the DOT Act or section 106 of the National Historic Preservation Act; or (4) Inconsistencies with any Federal, State, or local law, requirement or administrative determination relating to the environmental aspects of the action.

23 C.F.R. § 771.117(b).

7. Plaintiffs contend the NJDOT "recognized that there might be 'ramifications' due to the fact that [NJDOT] and FHWA had previously advised numerous agencies and the public *that there were sufficient potential environmental impacts to justify an EA and perhaps an EIS and now NJDOT and FHWA would be stating the opposite."* Plaintiffs' P.I. Brief at 5 (emphasis supplied). This argument, however, is disingenuous. Plaintiffs derive support for their contention from an NJDOT memorandum regarding the decision to pursue a CE for the project. The memorandum states:

> We did, however, discuss the ramifications of our previously initiating early coordination via a Notice of planned Action with an array of municipalities and review agencies, wherein we announced NJDOT/FHWA's intent to prepare and make available an Environmental Assessment for the [P]roject. It was agreed that we would have to re-notify these municipalities and agencies that we will now process the project under a CE in accordance with the change in regulations, and that this process may generate some controversy.

A.R. Vol. IV-2640. The memorandum does not indicate "sufficient potential environmental impacts to justify an EA and perhaps an EIS," as Plaintiffs claim. In fact, there is no mention of an EIS or any environmental impact. Rather, the memorandum indicates an acknowledgement that because municipalities and review agencies had already been notified, there might be concern due to a perceived loss of public input regarding the Project.

8. *See, e.g.,* 23 U.S.C. § 149 (providing Federal funding for HOV lane construction); 23 U.S.C. § 120(a) (same); 42 U.S.C. § 7509(b)(1)(B)(ii) (allowing grants under the Clean Air Act Amendments for the construction of HOV lanes).

the feasibility of adding HOV lanes in the area contemplated by the Project. A.R. Vols. IIB through IID. The steering committee was comprised of representatives from NJDOT, FHWA, the New Jersey Turnpike Authority, New Jersey Transit, the local Metropolitan Planning Organization, Morris and Somerset Counties, AT & T and various transportation management associations. State Defendants' Brief at 3. The study consisted of an exhaustive series of reports, questions, responses, letters and technical memoranda. A.R. Vols. IIB through IIE.

Based on the findings of the study, the decision was made to redesign the Project, which would now constitute constructing HOV lanes on Route 287 between Route 78 and Route 80. Hamby Declaration at ¶ 7. The Project was to receive some Federal funding through the Intermodal Surface Transportation Efficiency Act of 1991 (the "ISTEA"). A.R. Vol. IB–105 to 106.

The NJDOT, accordingly, submitted new documentation to the FHWA, justifying a CE for the Project, which now was designed solely to construct the HOV lanes on Route 287. A.R. Vol. IB–103 to 243. Hamby Declaration at ¶ 7. The NJDOT's justification for the CE classification was as follows:

This project comes from an approved State Transportation Improvement Program (STIP). This project is included in the year 1993–1997 Transportation Improvement Program (TIP) of the North Jersey Transportation Coordinating Council (NJTCC). The NJTCC TIP is part of the STIP. As required by the [Clean Air Act Amendments] of 1990, the NJTCC TIP was analyzed to determine its effect on the regional pollutant[s] such as Ozone. The analysis was performed in close consultation with the [United States Environmental Protection Agency] and the New Jersey Department of Environmental Protection Agency [sic] (NJDEPE). The results of this analysis showed that there will be reduction in the total burden of Ozone precursors in analysis years 1996 and 2007 with the build TIP scenario compared to no-build. The TIP and the TIP emissions analysis was approved by the [FHWA] and the Federal Transit Administration (FTA)

on February 3, 1993. Therefore, the referenced project satisfies the interim conformity requirements of the CAAA of 1990.

A.R. Vol. IB–121.

A study conducted by the Bureau of Environmental Analysis (the "BEA") also revealed the HOV lane construction would reduce congestion in the affected area of Route 287, reduce vehicle miles of travel, reduce volatile organic compound emissions, and reduce travelers' trip time. *Id.* Further justification for the CE classification included: no significant noise impacts are expected—ten noise barriers were recommended "where it is reasonable, feasible, and cost-effective" (A.R. Vol. IB–118 to 119; Hamby Declaration at ¶ 8(b)); no significant socioeconomic impacts are expected because all construction is to be performed within the existing right of way (A.R. Vol. IB–122; Hamby Declaration at ¶ 8(c)); any affected wetlands are within the existing Right of Way—and the Project would require a Freshwater Wetlands Permit mandating mitigation of impact (A.R. Vol. IB–124 to 125; Hamby Declaration at ¶ 8(d)); no archaeological impact was anticipated—if any sites were found, appropriate recovery action would be taken (A.R. Vol. IB–125; Hamby Declaration at ¶ 8(e)); and no historic structures were located within the areas designated for construction (A.R. Vol. IB–126; Hamby Declaration at ¶ 8(f)).

Based upon all of the documentation submitted, the NJDOT and FHWA concluded no significant environmental impacts were expected, and on 13 October 1993, the FHWA concurred in granting a CE to the Project. A.R. Vol. IB–115.

### 3. *The Continuing Review Process*

A Federal regulation, 23 C.F.R. § 771.129, requires a continuing review of a CE classification to determine whether the classification remains valid. 23 C.F.R. § 771.129(c). "[T]he applicant shall consult with the Administration prior to requesting any major approvals or grants to establish whether or not the approved environmental document or CE designation remains valid for the requested Administration action. These consultations will be documented when determined necessary by the Administration." *Id.*

In accordance with this requirement, the NJDOT initiated an Environmental Reevaluation (the "ER") to study any potential environmental impact resulting from the Project and to plan to minimize and mitigate any such impact. A.R. Vol. IB–385 to 440; Hamby Declaration at ¶ 9. In conjunction with the ER, numerous additional studies were conducted in an effort to be aware of any potential environmental impact. Hamby Declaration at ¶ 9.

The additional studies included a groundwater quality impact assessment report (as requested by the United States Environmental Protection Agency (the "USEPA")), an application to the New Jersey Department of Environmental Protection for an Individual Freshwater Wetlands Permit[9], a Carbon Monoxide "Hot–Spot Analysis" for the Morristown area, an Air Quality and Transit Feasibility Assessment submitted to the FHWA[10], a noise study submitted to the FHWA, and an archaeological survey report submitted to the FHWA. Hamby Declaration at ¶ 9(a) to (f). All of these studies and reports were prepared and submitted between 1993 and 1994.[11] Id.

On 20 April 1994, also as part of the continuing review process required by 23 C.F.R. § 771.129(c), a public hearing was held to receive public comments on and discuss the Project. A.R. Vol. IIIB–2190 to 2271. In conjunction with the public hearing, numerous written comments were also received. A.R. Vol. IIIA–2071 to IIIB–2189. The com-

ments were broad-based, relating to alternatives to the Project, permits, water quality, safety concerns, noise, construction monitoring, air quality, and environmental regulations. A.R. Vol. IIIB–2136 to 2163.

The NJDOT prepared responses to the numerous comments that were received. *See generally,* A.R. Vol. IIIB–2136 to 2163. The responses highlighted the NJDOT's rationale for selecting an HOV project on the Route 287 corridor. *Id.* The responses also individually addressed each comment and criticism set forth, either at the public hearing or in the written comments.[12]

In a letter, dated 10 September 1994 (the "10 September Letter"), the USEPA expressed unequivocal approval of the CE classification for the Project. Significantly, the USEPA concluded: "the proposed [P]roject will result in minimal impact to ground water quality. As such, [the USEPA] has determined that this [P]roject complies with the requirements of Section 1424(e) of the Safe Drinking Water Act." A.R. Vol. IE–507.

Additionally, the USEPA determined "the [P]roject-related wetlands impacts will be adequately addressed by the [New Jersey Department of Environmental Protection (the "NJDEP")] permitting process." *Id.* The USEPA also concluded the Project "will *reduce* air emissions slightly ... [and] will not cause significant adverse air quality impacts." A.R. Vol. IE–508 (emphasis added). Accordingly, the 10 September Letter concluded that although the USEPA had initially

---

**9.** In response to the NJDEP's comments, the NJDOT redesigned the Project to minimize potential wetlands impact. The total wetlands area that will be permanently impacted by the Project has been reduced to 1.9 acres, with another 2.07 acres being temporarily disturbed during construction. A.R. Vol. IC–343 to 345.

**10.** It was determined that by the year 2008, the Project would actually improve the air quality in the Project area by decreasing motor vehicle emissions. A.R. Vol. IIA–515, 520.

**11.** Plaintiffs' argument that Defendants are attempting to justify the CE through "[n]umerous studies [that] were produced subsequent to, and separate from, the completed NEPA process" is without merit. Plaintiffs' Opposition Brief at 29. The clear mandate of 23 C.F.R. § 771.129(c) requires NJDOT to conduct continuing studies to

establish whether the CE designation remains valid. NJDOT was also required to submit documentation, when necessary, justifying the CE. Plaintiffs' contention that Defendants are using all of the continuing review process documents to justify the CE *ex post facto* is misplaced.

**12.** For example, one critic accused the NJDOT of misleading the public by stating all permits had already been obtained for the project. The NJDOT's response made it clear that all permits had either been obtained, or were pending approval. A.R. Vol. IIIB–2144. Additionally, in response to public concern regarding increased noise, the NJDOT stated: "noise studies were not complete. Therefore, the [NJDOT] could not provide the details on the noise barriers [at the time of the hearing]." A.R. Vol. IIIB–2150. However, the NJDOT had plans to hold public meetings on later dates to discuss noise abatement and other topics. *Id.*

thought the CE classification was premature, "[The USEPA] believe[d], in the final analysis, that it was an appropriate National Environmental Policy Act action for this [P]roject." *Id.*

The NJDOT incorporated all of the information compiled during the continuing review process into the ER, which it submitted to the FHWA. Based on the NJDOT's ER submission, on 20 September 1994, the FHWA concurred in concluding that no significant changes had been made in the Project, the effect on the environment, the anticipated impacts, or the proposed mitigation measures since the original CE approval. A.R. Vol. ID–388.

*Discussion*

### A. Standard of Review for Summary Judgment Motions

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The present task, therefore, is to determine whether disputed issues of fact exist. A district court, however, may not resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *see also Desvi, Inc. v. Continental Ins. Co.,* 968 F.2d 307, 308 (3d Cir.1992) ("threshold inquiry is whether there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party") (citations omitted); *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1078 (3d Cir.1992) (the test is whether there is no genuine issue of material fact, and whether one party is entitled to judgment as a matter of law); *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991) ("summary judgment is inappropriate when a conflict of a material fact is present in the record"); *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir.1991) (summary judgment may not be granted "if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed").

All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Williams v. New Castle County,* 970 F.2d 1260, 1264 (3d Cir.1992); *Boyle v. Governor's Veterans Outreach & Assistance Ctr.,* 925 F.2d 71, 75 (3d Cir.1991); *Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir.1990); *Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989). "Any 'unexplained gaps' in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment." *Ingersoll–Rand Fin. Corp. v. Anderson,* 921 F.2d 497, 502 (3d Cir.1990) (quoting *O'Donnell v. United States,* 891 F.2d 1079, 1082 (3d Cir.1989)).

Although the summary judgment hurdle is difficult to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out the absence of a genuine issue of material fact,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with *specific facts* showing that there is a *genuine issue for trial.* Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (citations and footnotes omitted). In other words, the inquiry involves determining " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Brown v. Grabowski,* 922 F.2d 1097, 1111 (3d Cir.1990) (quoting *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512), *cert. denied sub nom., Roselle v. Brown,* 501 U.S. 1218, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991); *see also Gray,* 957 F.2d at 1078 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

The Court elaborated on the standard in *Anderson* : "If the evidence [submitted by a

party opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Court noted in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted); *see also Coolspring Stone Supply, Inc. v. American States Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir.1993) ("nonmoving party must adduce more than a mere scintilla of evidence in its favor"); *Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67, 72 (3d Cir.1990) (non-moving party may not rest upon mere allegations); *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990) (neither unsupported allegations in pleadings and memoranda of law nor conclusory allegations in affidavits will establish genuine issue of material fact); *Aronow Roofing Co. v. Gilbane Bldg. Co.,* 902 F.2d 1127, 1128 (3d Cir.1990) ("summary judgment will be granted where the non-moving party fails to 'establish the existence' of an element essential to the case").

In the instant matter, therefore, the court's inquiry is limited to determining whether there are any genuine factual issues, and whether Defendants are entitled to judgment as a matter of law. All evidence submitted must be viewed in a light most favorable to Plaintiffs, and all inferences must be drawn in their favor. If Plaintiffs have produced sufficient evidence to warrant sending this matter to a finder of fact, Defendants' Summary Judgment Motions must be denied.

### B. *The National Environmental Policy Act*

The NEPA requires Federal agencies to prepare an EIS for every "major [F]ederal action 'significantly affecting the quality of the human environment.'" *Limerick Ecology Action v. United States Nuclear Regulatory Comm'n,* 869 F.2d 719, 725 (3d Cir.1989) (citing 42 U.S.C. § 4332(2)(C)).

To this end, it structures governmental decisionmaking in two respects: "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Limerick,* 869 F.2d at 725 (quoting *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council,* 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983)).

*State of New Jersey Dep't of Envtl. Protection v. Long Island Power Auth.,* 30 F.3d 403, 409 (3d Cir.1994).

The CEQ has promulgated general regulations for the NEPA. Each Federal agency also has its own regulations. *Limerick,* 869 F.2d at 725. The CEQ regulations require an agency "to designate which classes of actions normally require EIS's, which classes normally require no environmental evaluation and may be regarded as [CE's], and which classes fall in the middle and require [EA's] to determine whether they will have a significant impact and thus require EIS's." *Long Island Power,* 30 F.3d at 409–10 (citing 40 C.F.R. § 1507.3(b)(2)).

When an EA is indicated, it "provides either a determination that the action will have a significant environmental impact and hence require[ ] an EIS, or a 'finding of no significant impact'.... indicating that no EIS is needed." *Id.* (citing 40 C.F.R. § 1508.9(a)(1)).

■ In the instant matter, at the time the NJDOT initially proposed the Project, the FHWA regulation providing for CE's on highway projects was narrow.[13] According-

---

13. At the time of the original Project proposal, the applicable regulation provided:

    (a) Categorical exclusions are categories of actions which do not involve significant environmental impacts or substantial planning, time or resources. These actions will not induce significant foreseeable alterations in land use, planned growth, development patterns, or natural or cultural resources. The categorical exclusions are listed in § 771.115(b).

23 C.F.R. § 771.117(a) (1986).

    Section 771.115(b) provided, in pertinent part:

    (b) *Class II (Categorical Exclusions).* Actions that do not individually or cumulatively

ly, the NJDOT indicated an EA would be required. A.R. Vol. IA–29. Subsequently, however, the regulations were amended, allowing CE's for a wider array of highway projects. 23 C.F.R. § 771.117. The NJDOT, however, was still required, pursuant to the mandate of the regulation governing CE's, to submit documentation "demonstrat[ing] that the specific conditions or criteria for the[ ] CE [is] satisfied and that significant environmental effects will not result." 23 C.F.R. § 771.117(d).[14]

The NJDOT submitted the required documentation in support of its request to the FHWA to grant a CE for the Project. In fact, the NJDOT submitted in excess of what was required for FHWA approval of the requested CE. When 23 C.F.R. § 771.117 was amended, it was expected "that the documentation [supporting an application for a CE] will be briefer than an EA since it will be focused on a limited number of environmental concerns and usually will not include an evaluation of alternatives as is often contained in an EA." 52 Fed.Reg. 32646, 32652 (1987). The NJDOT, however, submitted extensive documentation in support of the CE

request. *See* pp. 881–82, *supra.* Moreover, during the continuing review process required by 23 C.F.R. § 771.129(c), the NJDOT performed numerous additional studies requested by the USEPA, including a carbon monoxide "hotspot" analysis and a supplemental groundwater impact analysis (including additional mitigation measures). Federal Defendants' Brief at 5–6. The NJDOT also agreed to do an air quality analysis, the results of which indicated an actual reduction in total air emissions. A.R. Vol. IE–507 to 508.

■ In addition, the NJDOT applied to the NJDEP for a Freshwater Wetlands Permit, and redesigned portions of the Project to reduce wetlands impact. A.R. Vol. IC–343 to 353. The grant of a permit in and of itself should be given considerable weight in considering whether the FHWA's grant of a CE to the project was reasonable. "This approach is ... consistent with the policy favoring cooperation and avoidance of duplicative efforts among governmental entities which is encouraged by the [NEPA] regulatory scheme." *Miron v. Menominee County,* 795 F.Supp. 840, 845 (W.D.Mich.1992) (citing

---

have a significant effect on the environment do not require an environmental impact statement or environmental assessment. The following actions are categorical exclusions:

. . .

23 C.F.R. § 771.115(b) (1986).

The regulation then listed 29 categories, none of which could have been interpreted to include the construction of HOV lanes. This list comprised the extent of available CE's. The only other way to receive a CE for a project at the time was to "propose that additional categories of actions be added to the list of categorical exclusions in § 771.115(b). Such proposals shall be submitted to the Administration headquarters office for approval and will be processed in accordance with 40 C.F.R. § 1507.3." 23 C.F.R. § 771.117(d) (1986).

Accordingly, the only way the Project could have received a CE at the time of the original proposal would have been to get all such projects included on the list of CE's. The NJDOT opted to simply prepare an EA at that time.

14. Plaintiffs argue that the doctrine of *ejusdem generis* should be applied to 23 C.F.R. § 117(d). They argue that CE's "must be limited to categories similar in nature and scope to the categories listed in the subsection." Plaintiffs' P.I. Brief at 3. Plaintiffs' argument, however, is critically flawed in two important aspects:

First, the doctrine of *ejusdem generis*, provides "general words follow[ing] an enumeration of specific items ... are read as applying only to other items akin to those specifically enumerated." *Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 588, 100 S.Ct. 1889, 1895, 64 L.Ed.2d 525 (1980). The doctrine, however, is only to be applied to "ascertain[ ] the correct meaning of words when there is uncertainty." *Id.* (citations omitted). Plaintiffs, however, have not alleged that the regulation at issue is ambiguous. "[W]hen a statute speaks with clarity to an issue, judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." *Estate of Cowart v. Nicklos,* —— U.S. ——, ——, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992). The regulation at issue is clear, and there is no need to apply the doctrine of *ejusdem generis.*

Second, and more damaging to Plaintiffs' underlying claim, is that even if the doctrine were to apply, the construction of two HOV lanes, in the median of an existing highway, is strikingly similar to the addition of "auxiliary lanes (*e.g.* parking, weaving, turning, climbing)." 23 C.F.R. § 771.117(d)(1). Despite Plaintiffs' protestations to the contrary, the addition of HOV lanes can be viewed as entirely analogous to the addition of hill-climbing lanes on a highway, which may continue for miles, and are uniformly granted CE's.

42 U.S.C. § 4332(1)(D); 40 C.F.R. § 1500.5(b), (h) and (k)).

Pursuant to the NJDEP's request, the NJDOT also performed an analysis of alternatives to the Project. The analysis demonstrated the need for the Project, and that there were no feasible alternatives. A.R. Vol. ID–398 to 418.

As discussed, the NJDOT submitted all of the documentation to the FHWA. After reviewing all of the materials associated with the Project, the FHWA concurred in granting a CE to the Project, thus obviating the need to prepare either an EA or an EIS.

## C. *Review of the FHWA's Determination*

■ Judicial Review of agency action, such as the FHWA's decision to grant a CE to a particular project, is normally governed by the APA, 5 U.S.C. §§ 701–706. The applicable provision of the APA is 5 U.S.C. § 706, entitled "Scope of review;" it states:

> To the extent necessary to decision [sic] and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise re-

> viewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

Despite the apparently unambiguous language of the APA, the Third Circuit has reserved decision on the question of the standard of review to apply to an agency's determination that an EIS or EA need not be prepared for a particular project. *Long Island Power,* 30 F.3d at 415 n. 21; *Morris County Trust for Historic Preservation v. Pierce,* 714 F.2d 271, 278 n. 5 (3d Cir.1983); *Township of Springfield v. Lewis,* 702 F.2d 426, 436 (3d Cir.1983). The question remains open as to whether an administrative agency's decision not to prepare an EIS or EA "should be measured by the 'reasonableness' of that decision under the circumstances, or by the traditional 'arbitrary and capricious' standard contained in the [APA]." *Township of Lower Alloways Creek v. Public Service Electric & Gas Co.,* 687 F.2d 732, 742 (3d Cir.1982).[15]

In *Concord Township, Delaware County, Commonwealth of Pennsylvania v. United States,* 625 F.2d 1068 (3d Cir.1980), the Circuit

> found it unnecessary ... to join either group of opposing appellate courts. Instead, without deciding whether it was in fact the appropriate judicial standard, [the Circuit] proceeded to apply the 'reasonableness' test to the facts of the case for three reasons: first, because that test appeared to be preferred by the district courts under [the Third Circuit's] supervision; second, because there was 'much to be said in favor of subjecting these threshold determinations to the higher scrutiny on review,' and finally, because the particular agency decision under consideration

---

**15.** Other Circuits are split as to which standard should be applied. *National Trust for Historic*

*Preservation v. Dole,* 819 F.2d 1164 (D.C.Cir. 1987).

"pass[ed] muster even under the 'higher' measure of 'reasonableness.'"

*Lower Alloways Creek,* 687 F.2d at 742 (citing *Concord Township,* 625 F.2d at 1073).

The *Lower Alloways Creek* court similarly applied the reasonableness standard to the case before it. *Id.* The Third Circuit has repeatedly chosen the same approach when confronted with analogous situations. *See Long Island Power,* 30 F.3d at 415 n. 21 (finding the agency action valid under either test); *Township of Springfield v. Lewis,* 702 F.2d 426, 437 (3d Cir.1983) (adopting the *Concord Township* and *Lower Alloways Creek* approach); *Morris Cty. Trust for Historic Preservation v. Pierce,* 714 F.2d 271 (3d Cir.1983).

■ In the matter presently before the court, it is again unnecessary to determine the appropriate standard of review to be applied in this situation. Third Circuit jurisprudence is controlling. Accordingly, the FHWA's decision to grant a CE to the Project will not be disturbed if it is reasonable under the circumstances, "when viewed in the light of the mandatory requirements and high standards set by [the NEPA]." *Lower Alloways Creek,* 687 F.2d at 742.[16]

■ Under the more stringent "reasonableness" standard of review, the FHWA's determination must not be upset absent "a showing that the [P]roject could in fact significantly affect the quality of the human environment." *Id.* (quotation omitted). The burden of establishing substantial environmental issues is on Plaintiffs. *Id.* at n. 24. In order to satisfy their burden, they must establish a deficiency in the administrative record. *Id.* (citation omitted). Plaintiffs rely upon two affidavits from Michael A. Replogle ("Replogle") to support their argument that the Project would substantially impact the environment. *See* First and Second Replogle Affidavits.[17]

■ Plaintiffs contend the addition of two HOV lanes on Route 287 will lead to several negative results:

(a) an immediate and lasting increase in emissions of Nitrogen Oxides (NOx) and (b) a gradual increase in motor vehicle trips and vehicle miles of travel (VMT) using the single occupant vehicle lanes which will within a few years offset the VMT reduction associated with shifting some single passenger automobile trips into HOV–2 vehicles that will use the HOV–2 lanes. This increase in motor vehicle use is likely to lead in the longer term to (c) significantly increased emissions from this induced traffic of both Volatile Organic Compounds (VOC) and NOx, the

---

**16.** Although the standard applied by the court is high, an agency's interpretation of a statute that it administers is entitled to considerable deference, and will be upheld if permissible. *United States v. Riverside Bayview Homes,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); *Chemical Mfr's Ass'n v. Natural Resources Defense Council,* 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985); *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Moreover, even greater deference is afforded to an agency's construction of its own regulations. *Arkansas v. Oklahoma,* 503 U.S. 91, 112–13, 112 S.Ct. 1046, 1060, 117 L.Ed.2d 239 (1992); *Martin v. Occupational Safety and Health Review Comm.,* 499 U.S. 144, 148–50, 111 S.Ct. 1171, 1175, 113 L.Ed.2d 117 (1991); *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Facchiano Constr. Co. v. United States Dep't of Labor,* 987 F.2d 206, 213 (3d Cir.1993), *cert. denied* — U.S. —, 114 S.Ct. 80, 126 L.Ed.2d 48 (1993); *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 253 (3d Cir.1992); *Criger v.*

*Becton,* 902 F.2d 1348, 1351 (8th Cir.1990); *City of Alexandria v. FHWA,* 756 F.2d 1014, 1020 (4th Cir.1985) ("we should defer to the agency's interpretation of its own regulations").

**17.** A review of the FHWA's decision is to be based "on the record the agency presents to the reviewing court." *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985). Only if the agency's decision is not supported by the record should the matter be remanded to the agency for reevaluation. *Id.*

In some instances, however, "the bare record may not disclose the factors that were considered ... [and] it may be necessary for the District Court to require some explanation in order to determine if the [agency] acted within the scope of [its] authority ..." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). Because the Hamby Affidavit is submitted pursuant to this exception to the general rule, *see* Federal Defendants' Brief at 15, the Replogle Affidavits will also be considered.

two precursors of ozone and smog. These effects will delay the attainment of [F]ederal air quality standards in the region. First Replogle Affidavit at ¶ 6.

The First Replogle Affidavit discusses the means utilized by Replogle in arriving at his conclusion regarding the impact on air quality caused by HOV lanes. The Second Replogle Affidavit's focus is primarily a criticism of the NJDOT's alleged failure to explore alternatives to the Project. Specifically, Replogle concludes:

> In view of the significance of the likely environmental impacts of the I–287 capacity expansion project, it is essential that FHWA and NJDOT be required to prepare an EIS and associated [major investment analysis] that looks systematically at a transportation demand management program based on transit, pricing and land use options dealing with both work and non-work travel, as an alternative to capacity expansion.

Second Replogle Affidavit at ¶ 9.

The two Replogle Affidavits comprise a total of twenty-six pages.[18] The Administrative Record in this case comprises eighteen volumes consisting of 2,770 pages documenting potential environmental impact. *See* A.R. Vols. IA through IV. As discussed, the USEPA, the Federal agency responsible for overseeing the protection of the environment, unequivocally supported a CE categorization for the project. The conclusion was based on the USEPA's coordination with the BEA to address all environmental concerns. A.R. Vol. IE–507.

The NJDEP also concluded that "the addition of HOV lanes will not adversely effect [sic] air quality within the city of Morristown carbon monoxide (CO) nonattainment area, as well as throughout the overall corridor [affected by the Project]." A.R. Vol. ID–423. These conclusions by the USEPA and NJDEP, two "watchdog" agencies responsible for monitoring the environment, were considered by the FHWA in its decision to grant a CE to the Project.

■ The NJDOT has also analyzed possible alternatives to the Project. *See e.g.* A.R. Vol. ID–374 to 376 (discussing analysis of mass transit feasibility in the Project area); ID–398 to 418. Moreover, the opportunity for public input, one of the important objectives sought by Plaintiffs, *see* Second Replogle Affidavit at ¶ 9, has been afforded. A.R. Vol. ID–389 (citing a 29 March 1994 Official's Briefing; a 20 April 1994 Public Hearing; and two "noise information centers," held on 7 September 1994 and 12 September 1994).[19]

When any individual or entity (such as Plaintiffs) seeks to interfere with an NEPA-related administrative proceeding, any comments made "must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern. The comment cannot merely state that a particular mistake was made . . .; it must show why the mistake was of possible significance in the results." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 553, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978) (quoting *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 394 (D.C.Cir.1973), *cert. denied sub nom. Portland Cement Corp. v. Administrator, EPA,*

---

18. Seven of the twenty-six pages consist solely of an overview of Replogle's qualifications as an expert in the area of environmental impact with regard to transportation projects.

19. Under the applicable Federal regulations:

> one or more public hearings [must be held] for any Federal-aid project which requires significant amounts of right-of-way, substantially changes the layout or functions of connecting roadways or of the facility being improved, has a substantial adverse impact on abutting property, otherwise has a significant social, economic, environmental or other effect, or for

which FHWA determines that a public hearing is in the public interest.

23 C.F.R. § 771.111(h)(2)(iii). Actions for which a CE has been granted, therefore, will not normally require a public hearing because in granting a CE, the agency has found that there is no such impact. In fact, even EA's do not require public hearings unless the conditions listed in 23 C.F.R. § 771.111(h)(2)(iii), above, are present. Moreover, 23 C.F.R. § 771.117, the regulation governing CE's, is silent as to public hearings. Although NJDOT conducted several hearings, they were under no obligation to do so. Plaintiffs' claim that lack of public hearings is fatal to the Project is, therefore, without basis.

417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974)).

As the Third Circuit stated in *Lower Alloways Creek* :

> [I]t is incumbent upon [Plaintiffs] who wish to appeal a NEPA-related determination to structure their participation so that it is meaningful, so that it alerts the court to the [Plaintiffs'] position and contentions. Judges are neither scientists nor technicians; if judicial review of agency decisionmaking is to be productive and profitable, courts must insist that litigants provide them with sufficient information and analysis to assess critically the validity of the allegedly improper agency action.

*Lower Alloways Creek,* 687 F.2d at 743.

In the instant matter, the NJDOT has provided more than sufficient information to the FHWA for the decisionmaking process. Plaintiffs simply have not met their burden to show that the FHWA made a material mistake in its decision to grant a CE to the Project. The goal of the NEPA is to "insure a fully informed and well-considered decision" on the part of the Federal agency making a particular determination. *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980) (citing *Vermont Yankee,* 435 U.S. at 558, 98 S.Ct. at 1219). The "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 1846, 104 L.Ed.2d 351 (1989).

The decision rendered by the agency need not be the same decision a court would make if it were a member "of the decisionmaking unit of the agency." *Id.* The agency need not elevate environmental concerns over other appropriate considerations. *Id.* In fact,

> once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'

*Id.* (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976)). The NEPA requires no more than the Federal agency consider the environmental consequences of its decision. *Strycker's Bay,* 444 U.S. at 228, 100 S.Ct. at 500.

In the instant matter, the Project was a response to years of requests from the community to provide relief to the commuters using Route 287. A.R. Vol. IA–26 to 27; Reply Brief at 9. Additionally, the level of action determination for the Project described the surrounding area as "very developed," including industrial, commercial and office buildings as well as residences. A.R. Vol. IB–210; IIB–1087. In light of these factors, the proposed Project is reasonable.

The FHWA, before reaching its determination that the Project qualified for a CE, reviewed volumes of data, reports, letters, memoranda, comments, etc. *See* A.R. Volumes I through IV. Much of the information was reviewed by the FHWA after the initial CE determination, during the continuing review process. The FHWA, therefore, had ample opportunity to change its initial decision based on new information presented during the continuing review process.

The FHWA reviewed the original level of action determination report, which indicated no significant environmental impact would result from the Project. A.R. Vol. IA–26 to 47. The NJDOT demonstrated that no significant socioeconomic impact would occur because all widening would occur within the median, on the existing right-of-way. Hamby Declaration at ¶ 4. No archaeological impacts were expected because all construction on the Project is to occur within the existing median, which has already been disturbed by highway construction. *Id.* No historical structures are located on the site of the Project. *Id.* All environmental regulations are to be complied with during construction. *Id.* Wetlands impact has already been minimized, and any remaining impact will be mitigated and all construction will comply with Federal and state permit requirements. *Id.* And, a noise study will determine where noise barriers are necessary and cost-effective. *Id.*

The FHWA considered all of the foregoing information submitted by the NJDOT. Based on that information, the FHWA's determination that the Project should be granted a CE is reasonable. Moreover, the Project in this matter is factually distinct from the cases cited by Plaintiffs to support the position that further studies should be undertaken in the instant matter. For example, in *Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir.1985), the project at issue involved the building of a cargo terminal and a causeway onto an undeveloped wooded island. The intention of the project was to cause industrial development on the island. Predictably, the court found the project would "radically alter existing land use," and would accordingly require an EIS. *Id.* at 881.

The project proposed in *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir.1975) was a highway interchange in a rural area. The project was not proposed to meet "existing demand for freeway access but to stimulate and service future industrial development [in the area]." *Id.* at 667. In the instant matter, the Project is designed to meet existing demand in the most environmentally sound manner possible. The Project was proposed in response to citizen complaints regarding congestion in the area. *See supra.* Moreover, the instant Project is carefully tailored to comply with environmental requirements, and is in fact designed to reduce existing environmental impact.

The FHWA considered the environmental consequences of its decision to grant a CE to the Project. By contrast, the Replogle Affidavits, Plaintiffs' source of support for their claim, hardly amount to categorical proof that significant environmental impact will result from the Project. The mere fact that experts may disagree on the Project is insufficient to warrant reversal of the FHWA's determination. If all that is necessary to require an EIS or EA is a conflicting expert's opinion, the agency's process would be meaningless. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335 (9th Cir.1992). In *Greenpeace*, the court noted:

> An agency's careful evaluation of the impact of its proposed action, its collection and review of evidence, and its reasoned conclusions as to what the dat[a] reveals would be for naught if by simply filing suit and supplying an affidavit by a hired expert, predicated upon the same facts relied upon by the agency but reaching a different conclusion, a litigant could create a controversy necessitating an EIS [or EA].

*Id.* See also *County of Bergen v. Dole*, 620 F.Supp. 1009 (D.N.J.1985), *aff'd* 800 F.2d 1130 (3d Cir.1986). In the instant matter, Plaintiffs have done nothing more than submit the Replogle Affidavits, which analyze the same data considered by the FHWA but reach a different conclusion.

Issues of fact are genuine "only if a reasonable jury [or fact finder], considering the evidence presented, could find for the non-moving party." *Childers v. Joseph*, 842 F.2d 689, 694 (3d Cir.1988) (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510). In this matter, Plaintiffs have not pointed to anything that would overcome the overwhelming weight of evidence in Defendants' favor. Plaintiffs appear to base their objection to the Project on an ideological view that fewer highways will inspire more people to seek alternative means of transportation or to stop using existing highways. Plaintiffs' objection, however, does not constitute a basis for finding the FHWA's decision in this matter to be unreasonable. Plaintiffs have simply not presented a genuine issue of material fact in order to defeat Defendants' Summary Judgment Motions. The inquiry is, therefore, at an end. Defendants are entitled to prevail on their Summary Judgment Motions.[20]

20. Plaintiffs have also claimed that the CAAA and ISTEA require more environmental assessment than was done in the instant matter. This argument is irrelevant because Defendants have not relied on either the CAAA nor the ISTEA as justification for the CE designation presently at issue. Defendants' Reply Brief at 16–18. In fact, the approval date of the Project allows it to be grandfathered from any further studies that may have been imposed by ISTEA. Accordingly, any reference to ISTEA as justification to interfere with the FHWA's determination in this matter is misplaced.

Moreover, the CAAA actually sees HOV lanes as measures to be considered for emissions reductions. *See* 42 U.S.C. §§ 7511a, 7408(f)(1)(A)(iv). They have been recognized as a means to aid employee trip reductions, which

*Conclusion*

For the reasons set forth above, Plaintiffs' Motion for Permanent Injunction is denied; Defendants' Summary Judgment Motions are granted.

is required by the state of New Jersey. *Id.* As such, the Project not only complies with Federal regulations, but it, and similar projects, are actually approved and encouraged by CAAA.